Good morning. My name is Robert Keene, and I represent the appellant in this case, Kathleen Marie Paterson. To please the Court, I'd like to reserve a couple of moments at the end for possible rebuttal. As the Court is aware, this appeal presents two primary issues. Our time this morning is somewhat limited, so I'd like to limit my remarks to the first issue concerning the question of whether the beneficiary change was effected in compliance with what the policy required. The provision at issue here contemplates essentially a three-step process. First, the naming or changing of a beneficiary during the lifetime of the insured. Second, written notice to the insurer of that change. And third, retroactive effectiveness of the change, of course, without prejudice to any payment made by the insurance company in the interim. The District Court seems to have essentially collapsed the second and third steps into a single step, and seems to have concluded that there could be no change, effective change, without a transmission of the beneficiary change to the insurance company while the insured was still alive. Now, that necessarily had to disregard the third sentence of the beneficiary change provision concerning retroactive effect. And we know the California law, in general, disfavors such an interpretation. For example... Why would you have to disregard the third sentence? Well, if there can be no effective change without the beneficiary change being submitted during the insured's lifetime, then there would be no reason to provide for retroactive effect back to the date the change was signed. And as I'll explain in just a minute, that seems to have been precisely what was considered and decided and explained by the Indiana Supreme Court in the Bowers case. So we know that California law doesn't favor a result where contract language is disregarded. For example, California Civil Code 1641 instructs that all parts of a contract be taken into account, with each part of the contract being used to interpret the other parts of the contract. We also cited some case law in the reply brief, standing for the proposition that interpretations of insurance contracts which render certain language mere surpluses are to be avoided if possible. And that's where the Bowers decision comes in, for the decision from the Indiana Supreme Court. The appellee in this case has described the Bowers case as dissimilar, but to the contrary, Bowers is quite important because it concisely explains why a beneficiary change provision, essentially identical to the one involved here, will be given retroactive effect once received by the insurance company, as well as the related and extremely important point that there'd be no reason to provide for such retroactivity if the insurance company had intended that the beneficiary change could only be submitted while the insured was still alive. Now I realize that this morning I'm addressing two members of the panel that produced the parties' briefs, so I'd like to make a few comments about that case. The ACP decision is not a lengthy one. But at three places in that decision, the panel said something which I think underscores the distinction between ACP and this case. Yes, to be sure, the panel pointed out that the insured in ACP, her name was Danielle, had the exclusive right to change the beneficiary of the policy because she was the policy owner. And for obvious reasons, the appellee in this case loves that language. But the ACP panel went a bit further than that and plainly left open the possibility that instructions given by the policy owner to a third party, and clearly we have evidence of that here, could be sufficient to bring about a valid beneficiary change even after the death of the insured. Yeah. Well, of course, ACP is a memorandum of disposition, not binding in terms as precedent. It may be a clue to the thinking of two members of this panel at the time we thought it, but I have to confess I had no memory as I got into this case of ever having decided or voted on ACP. But let me look at this policy and this case rather than that case. Certainly. As I look at the change of beneficiary language in the policy, it seems to me pretty obvious that there must have been a request by the insured during his lifetime in order for the change to take effect. How do we get around that? I don't read it the same way, Your Honor, quite honestly. Certainly, if somebody asked me to redraft this provision today, I would take the word requested and change that, well, change the provision so that it says instead of it will be effective as of the date the policy owner requested it, I would make it read it will be effective as of the date the policy owner signed the beneficiary change. That's what I would change. But the problem with that reading is that if that's what the policy says, and there's nothing that says the policy can't say it that way, but if the policy operates that way, that means that someone can make a request in the sense of signing it, give it to somebody else and say, would you hand that in when I tell you to because I'm thinking about this and I may be on a trip to Africa and I want you to be the one to do it. But until the request is made, would you hand in the thing that I've signed, it's pretty clear that the policyholder doesn't yet intend to make the change. So this language says at the time the policyholder requests it, which I think is a more secure way of finding out what the policyholder actually wants. As a matter of policy, that might be a better way to approach it, but I think that interpretation has to disregard the final sentence of the provision, which says that the change will not apply to any payment made or action taken by us before it was received or recorded. If the change had to be made while the insured was still alive, there would be no need for the retroactivity language. I mean, you know, the only way a payment is going to be made under life insurance policy is if the insured dies. Okay? So this third sentence seems to me to clearly address the possibility that by the time that change is submitted, the loss may have occurred. You use the hypothetical of somebody traveling overseas and entrusting the form to somebody else. That's not what we have here. I mean, we know that Jeffrey Clark gave the form to his sister for safekeeping pending the conclusion of his divorce proceedings. In the Bowers case, for example, the policyowner was apparently terminally ill with cancer. She made the beneficiary change. She gave it to her sister. Now, her instructions were a little bit cryptic. She said, in case something happens, but I think she probably was contemplating her own demise. It just seems to me that if you look at this provision, and with particular emphasis on the final sentence concerning retroactive effect, you consider the way the Indiana Supreme Court construed a virtually identical provision, the only reasonable interpretation is that it was permissible, even if not necessarily desirable as a matter of certainty, for the form to be submitted after the death of the insured. Now, in ACP, there was a complete void of information or evidence about what happened between the time the policyowner signed the beneficiary change form and where her second husband discovered it weeks later after her death. We don't have that issue here. We have a relative trove of information about what happened before, during, and after the time the provision was signed. We know, for example, that it was signed at virtually the height of the hostilities during what seems to have been a particularly acrimonious dissolution proceeding. We know from the testimony of the third-party witness who saw Jeffrey Clark sign the form, and who obviously authenticated it, why he did it, why he wanted to make the change, and that he knew he couldn't, or he'd been told by his lawyers, he couldn't formally make the change until the divorce proceeding was concluded. And finally, we have the testimony of Jeffrey's sister that he entrusted it to her for safekeeping pending the conclusion of that divorce. Is there anything in the record that tells us about Jeffrey's, or Jeff's, state of health? That is to say, was this an unexpected death? I just don't know the answer to that. It was certainly an unexpected death. The reason I'm pausing is I believe most of this was fleshed out before the district court, and I just don't remember how much of this, if any, found its way into the record before this court. His health, as I understand it, was... If it's in the district court, then it's in the record. So I'm not sure what you're saying. Well, that was a preface to answering the question. His health was good. Certainly he had no conditions anyone's aware of that would have suggested a death was a possibility. He wasn't even yet 50 when he died. It was certainly an unexpected death. What did he die of? Was it being hit by a car? No, it was a sudden medical death. It was a medical condition? Yes, yes it was. But you're representing this was not something, based on the record in the district court, this was not something that was anticipated? To all accounts, that seems to be the case, yes. It was a sudden and unexpected death. Well, I think a fairly reasonable guess as to what happened is that he didn't quite get around to it, even though he intended it. But another plausible guess is maybe he changed his mind. Well, there's certainly no evidence he changed his mind. And in terms of getting around to it, I mean, he had eight days between the end of the divorce proceeding and his death. I'm sure he did... I mean, I think he manifested his intent to, as you put it, get around to it, when he made the change back in 2009. He was constrained from actually doing that until whatever date it was in November 2012 that he died. Yeah, you know, that's a long time between signing and the ability that, as you say, the divorce becomes final, so the injunction is lifted. Apparently he didn't seek any... I mean, you can seek a modification from the court, but he didn't do it. I mean, a lot of things could have changed in his head in those, I think, pretty much almost three years. Well, I think that's certainly possible, but that's, I mean, that's where I guess I would say there is no evidence whatsoever of that. And actually, I'm sorry, Your Honor. I'm trying to remember what divorce proceedings are like in California. My recollection is you get an interlocutory decree of dissolution, and then six months later it becomes final. Is that still the case? I really don't know. I know from reviewing the divorce file in this case, it was a little bit out of the ordinary in the sense that I think Jeffrey went essentially unrepresented for the last two or three years of the proceeding. And frankly, I'm not sure how active a participant he even was by that point in time. He had counsel at first, but after a while did not. And Judge Fleming? I'm just trying to understand whether when the divorce became final, this would have been an event that was somehow marked for him. I don't think it's something that happens in court. You get it, and then you know. It's not like being acquitted in a criminal case. I may feel like it, but I think what happens is something happens in court. You get an interlocutory decree, and then six months later it becomes final, and you may or may not get something in the mail from the court sometime after the decree becomes final. You probably do get a final decree, which you might not have gotten in the mail until close to his death or after his death. It's certainly possible. But there's nothing in the record about that. All we know is that the finality of the proceedings was on November 16th, and he died on November 24th. That's what we know. And how do we know that the finality of the proceedings was on November 16th? I think it was presented to the district court by way of either interrogatory responses or requests for admissions. In other words, it was not disputed below. It wasn't like evidence of a piece of paper that he had or anything like that. No. I've seen such a piece of paper. I do not believe it. To my recollection, it did not make its way into the evidence before the district court, and it's probably not in the excerpt. It wasn't now. Judge Fletcher, just to respond to something you said a minute ago, you surmised that a lot of things could have changed between May 2009 and the end of the divorce proceeding. I forgot to mention I wanted to just remind the court that in the declaration of Jeff's sister, my client, she did comment on the fact that between May 2009 and the end of the divorce proceedings, they would have occasional discussions where the matter of the beneficiary change would come up. Apparently, each time they had such a discussion, he felt the end of the dissolution proceeding might be just around the corner. So I think there is certainly some evidence, and I don't think it's disputed in the record concerning his ongoing intent to make that change. Okay. Thank you. I think this is a cue for you to sit down. You're way over your time. I was just glancing at my notes, and I think they're telling me the same thing. Thank you, Your Honor. Thank you. Good morning. May it please the Court, I'm Stephen Galton for the cross-claimant and appellee, Glenda Clark. I'd like to focus on the policy language because counsel said that all that was required to change the beneficiary was filling out a form and having it sent in. The policy, however, states that the policy owner may name or change beneficiaries or contingent beneficiaries at any time during the lifetime of the insured after the name interchange is recorded at our home office. It will be effective as of the date the policy owner requested it. And the district court correctly observed that, quote, this portion of the provision contemplates a request from the policy owner to change the beneficiary. Okay. Why isn't signing the form a request? Why isn't signing the form a request? Well, he signed the form three and a half years before he died. We don't know why he signed the form. It could be that he- You're not answering my question. Yes? Why isn't signing the form a request? Because it was never communicated to the insurance company. Why does it have to be communicated? Well, the district court said a request- What if he signs it and puts it in the mail? Well, he didn't do anything in this case. This is what we call a hypothetical. Yes. And telling me that's not the case doesn't help any. So let's say he signs it and puts it in the mail. Because there's- No, no, no. You answer my question. Yes. And then you can explain. Has he made a request? No, he has not. He has not made a request, even if he signed it and put it in the mail? Well, if you put it in the mail, yes. But that's a different situation. No. And that indicates- You're kidding. You think I don't understand it's a different situation? So if you sign it- Yes. And you put it in the mail, that is a request. Yes? During his lifetime, I think that probably would be. Okay. In this case- So why if you- What if you hand it to a messenger? You say you sign it and then you hand it to a messenger and say take it down to the life insurance company and hand it over. Is that a request? Well, he's making a request in your situation. I'm asking questions and your job is to answer my questions. No, it's not. He gives it to a third party three and a half years before he dies. That is not a request, Your Honor. Well, that's not what I asked. Instead of putting it in the mail, let's say you give it to a messenger. Let's say you use FedEx instead of the mail. Well, Your Honor, there are cases, deathbed cases, where a person is dying and they- You know, what am I going to get along at all if you keep not answering my questions? If you don't want to answer, that's fine, but then you're not helping your client at all. Well, Your Honor, if- Do you understand the question? I understand the question. Can you answer the question? It is not a request if the insured does not communicate with the insurance company. So let's say he signs the form and gives it to a messenger, a commercial messenger. Is that a request? It could be, Your Honor. The cases have held in California that on a deathbed, if a person manifests a desire to change the beneficiary by giving it to a messenger when he hasn't the ability to mail it to the insurance company, that's sufficient. Here, none of those facts exist. Are those cases involve a policy that uses the word request? This policy- No, no. The cases you refer to, do they use the word request? I don't- Are they the same languages here? In what policy, Your Honor? I'm sorry. You said there are cases. Yes. Okay. Those cases involve a policy that's worded the same as this one? The cases, the deathbed cases, I can't answer that, Your Honor. I don't know. But the court has felt that it's significant if the person doesn't have the ability- Then answer this question. Why is signing the form and then handing it to the sister with a request- Because- If you're not going to let me finish the question- Because any number of things could happen- If you don't let me finish the question, you're not going to answer the wrong question. The insured could change his mind, Your Honor. In the three and a half years, we don't know what the insurer's intent was. But he didn't change his mind. He didn't say ask for the form back. He hands it to the sister and says, I've signed the form. I want you to send it to the insurance company when my divorce becomes final. And she did all of that. She did wait until the divorce became final and sent it in. Why is it not a request? It's not a request to the insurance company. Why not? The policy states- Why isn't it a request? Well, the district court observed that a request requires a communication with the insurance company. But you've already said that if you put it in the mail, that's a request, even though they haven't received it. Why isn't going through the sister and saying, I'm giving it to you for delivery to the insurance company, why isn't that a request? Eventually, that was completed. Eventually, they did read the insurance company. It reached it before they paid out the money, so the last sentence doesn't apply. Why isn't that a request? I would submit, Your Honor, that there's a material difference between sending a request to a third party and sending the request directly to the insurance company. In the latter case, it manifests an intent that the beneficiary be changed. In the former case, it may represent an intent at an earlier point in time, but not at the- Why? I mean, it's not at all obvious to me that that's the case. I mean, you have the option of asking for it back. Yes. You have an option of changing instructions. But if you hand it over, you hand it over and you say, send it to the insurance company, and then you never ask for it back, why isn't that a request? Why isn't that you've done everything you could do to communicate to the insurance company? And eventually it does reach the insurance company after the death of the insured. I don't see why that's not a request. I'm not sure why that's not a request. The court in the ACP case- No, I'm public in this position. Don't even bother talking to me about it. By two of his colleagues who he ignores constantly. Hey, listen, I ignore my own disposition, so I'm not treating you any worse than I treat myself. Public dispositions have no presidential value. They are not subject to a ban called. They're nothing. So you've got to come up with something better than that. Well, Your Honor, I think there's a material difference between making a request to a third party some years before and making a direct request to the insurance company. What is the material difference? Explain it to me, because I don't understand. It has to do with evidence of intent, evidence of a current wish to change the beneficiary. But none of that is in the policy terms. Policy terms says you've got to make a request. It doesn't say you've got to have a current intention. It doesn't have anything like that. In fact, if you look at the policy terms, you've got that last sentence that opposing counsel talked about, which only makes sense if you contemplate a situation where this thing reaches the request, reaches the insurance company after the insured is dead. Otherwise, that sentence makes no sense at all. How do you explain that sentence? Well, the district court interpreted it, and I think correctly, to say that there has to be a communication with the insurance company. Otherwise, the sense is meaningless. You know, I say potato and you say potatoe. I asked you a direct question about how you would interpret that last sentence, and you tell me something else altogether. Do you understand the question? I interpret it to mean that the request means a request to the insurance company. No, no. That last sentence, the one that says, it will not apply to any payment made or action taken by us before it was recorded. How can that sentence ever have any meaning unless you have a situation where the request is made before the while the insured is alive, which has to be because requests have to be made before and they don't reach the insurance company until long after he's dead and they've already paid out the money. How else does one make sense of that provision? The sentence means that that would be the earliest date on which the change could be effective. Well, give me a scenario where that sentence would come into play. I mean, give me an example of how it would have an effect that would be consistent with your theory of the case. If the insured signed a beneficiary change form, let's say, in 2011 and died in the same year sometime, but the change could not be effective prior to the date. Well, I mean, complete the thought. I mean, he makes a change, dies, and then some time passes to the point where the insurance company has actually paid out the money, which we know they don't do in 24 hours, but, you know, it takes them some time. So that somehow the form, the request, must have reached them after he died, or else that sentence makes no sense at all. Right? It has to be that. It has to contemplate exactly the case before us. I can't imagine what other scenario we could contemplate. And you haven't given me any, although you've probably had more time to think about it than I have. So by the district court interpretation, your interpretation, we would have to say that sentence in the policy is null and void, is superfluous. Superfluous, perhaps. Well, let me, can I take a slightly different tack here? For purposes of the question I'm about to ask, I'm going to assume that several of Judge Kaczynski's hypotheticals result in a request. That is to say, I drop it in the mail, that's a request. I give it to FedEx, that's a request. I give it to a courier, that's a request. I give it to my sister with directions to submit it to the insurance company, that's a request. Is there anything in this record that tells us that Jeff ever directed his sister to transmit it to the insurance company? Only her declaration. Well, her declaration doesn't say that. That's the only, only... I'll read you her declaration. Her declaration says, Jeff told me he was sending these items to me for safekeeping because he did not believe the items would be safe or private where he was staying at the time. He explained to me that he wanted to keep the change of beneficiary form for him until his divorce from Glenda was final. Jeff told me his divorce attorney has explained to him the beneficiary could not be formally changed until the divorce had been concluded. There's nothing in here that says Jeff told me to send it in to the insurance company. I would agree with that, yes. So that takes this case out of all of those hypotheticals. Yes, there's evidence that we've objected to as hearsay that he gave to her for safekeeping, essentially, but no direction that it be submitted to the insurance company. Is that what you rest your case on? I'm sorry? Is that what you rest your case on? I'm not sure what you mean by that, Your Honor. That's your argument. The argument is that there has to be a communication with the insurance company. Leaving it for safekeeping with the beneficiaries is not sufficient. He could have changed his mind in the three and a half years before he died. Is there any evidence he did change his mind? I'm sorry? Is there any evidence he did change his mind? There's no evidence one way or the other, Your Honor. We don't know what his state of mind was in the three and a half years after May of 2009. We don't know. Okay, thank you. You're over your time. Would you like to take a minute for rebuttal? Yes, Your Honor, briefly. It seems to me the word requested is used in the second sentence of this provision is arguably ambiguous if you're only looking at the second sentence. Once you look at the third sentence, it's pretty clear what it means. Under those circumstances, this provision ---- But what's your answer to Judge Fletcher's question as to whether there was a request here, whether there was any evidence that he actually requested this be done? Well, I think the request, bearing in mind the third sentence of the provision, is the beneficiary change for him itself. As far as transmitting it to the insurance company, no, he didn't. I mean, his first order of business, I think, was concluding his divorce proceeding. As I said earlier, he was a young man. He died suddenly. He probably wasn't expecting his own death, contemplating his own death. And let's bear in mind, in Bowers, the instructions were not much more specific than the instructions here. The owner gave it to her sister and said, hang on to this in case something happens. And then that's all she said. It wasn't a specific instruction to pass it on to the insurance company there either. So what case is that? The Bowers v. Kushnick case, the Indiana Supreme Court decision construing what I think is a virtually identical beneficiary provision. Okay. You know, in fairness to Judge Pregerson, this particular issue wasn't briefed with nearly the detail at the district court level that it's been briefed here. For that reason, he never addressed that third sentence of the beneficiary change provision. Yes, he concluded the request meant the communication to the insurance company. Well, I read that last sentence as just saving the insurance company in case it is really, really slow in recording. Well, with respect, Your Honor, I read it the same way the Bowers court read it. It protects the insurance company against having made a payment before they get the provision. It's okay to get the provision. But no, but the word is recorded. It doesn't say when we receive it. It says when we record it. Oh, well, on that point, I mean, we don't know if when this insurance company received it, it was recorded. But in one of our briefs, I cited a couple of California cases which say recording is a ministerial act. If it's something outside of what the owner has power over and occurs subsequent to whatever the owner has had to do, we don't hold it against the owner. There are a couple of cases cited for that proposition. Okay, thank you. Thank you, Your Honor. Agent Sargio will stand some minutes.
judges: Kozinski, W. Fletcher, Gould